#### IN THE

## SUPERIOR COURT

#### OF THE

## STATE OF LOUISIANA.

———◆◆◆————

### FALL TERM—1812—FIRST DISTRICT.

————◆◆————

### *JACOB & AL.* vs. *URSULINE NUNS.*

THE petition stated that the plaintiffs' father, a free black man, acted as overseer on the plantation of the defendants, since the year 1796, till his death in 1811—that in 1801, the superior of the convent made a donation to him of two arpents of land fronting the river, with the usual depth, for his services ; and in the year 1804, the superior, and nuns entitled to a vote in the chapter, confirmed the donation—that he remained in possession of the premises till his death, devising it to the plaintiffs—and that the nuns have since sold the premises, and the purchaser has drove off the plaintiffs. The prayer of the petition was, that the defendants might warrant and protect the plain-

Party, relying on the generosity of him, for whom he works, may not, when disappointed, set up a claim upon his justice.

FALL 1812.
I. District.

JACOB & AL.
*vs.*
URSULINE
NUNS.

tiffs' possession, or compensate them for the services of their father, whose executors they are.

THE plaintiffs' counsel produced a writing, subscribed by the superior of the convent, by which she makes a donation of the premises " to " Jacob, a free negro, who has served us with so " much fidelity, *without having ever enjoyed his* " *freedom.*"

NEXT was introduced an instrument, by which the superior and vocal nuns give to Jacob the usufruct of the premises.

*Livingston*, for the defendants. These instruments cannot be received; the nuns could not dispose of their land, without the authority of the ecclesiastical superior, the bishop or his vicar-general.

THE power of the superior (ordinary or bishop) shall extend to spiritual, as well as to *temporal* affairs. *Constitution of U. Nuns, part* 3, *chap.* 1, *art.* 4. He shall sign . . . . . . all *contracts* and leases, &c. *art.* 7.

ALL ordinary expenditures shall be made, on the ordinance of the superior nun, and in case of notable or extraordinary expenditures, she shall consult the assistants, *zélatrice,* and depositary, and have the superior's, ordinary or bishop's, leave. *chap.* 4, *art.* 12. The superior nun shall not give, by her sole authority, more than 20 sous in

alms or gifts; neither shall she do this often: and she, and the discreet nuns, may only give the value of one crown, *art*. 13.

WHEN it shall become necessary to commute *(commuer)* any part of the real estate of the convent, or to bring a suit, the superior nun shall never do so without good counsel, the advice of the discreet nuns, and the permission of the superior, ordinary or bishop. *art*. 15.

*By the Court.* Communities, in the civil law, are considered as under a perpetual nonage, and those who administer their estate, cannot alien it, without a special licence.

*Morel,* for the plaintiffs. The principal object of our suit, is compensation for services rendered. We introduce these writings as a recognition of them.

*Livingston,* for the defendants. The plaintiffs' father was a black man, once the slave of the defendants; his emancipation must be proven, before his wages are claimed.

*Morel,* for the plaintiffs. By the instruments before the court, the plaintiffs acknowledge him, and treat with him as a freeman.

*By the Court.* These instruments do not bind the community, being made without the requisite

FALL. 1812.
I. District.

JACOB & AL.
*vs.*
URSULINE
NUNS.

FALL 1812.
I. District.

JACOB & AL.
vs.
URSULINE
NUNS.

licence. Nothing, therefore, which they contain, can bind the defendants.

ON a *subpœna duces tecum* being obtained, a notary attended, with a proper deed of emancipation, executed with the licence of the bishop of Louisiana. Witnesses were next heard, who deposed that the deceased served the defendants as the overseer and driver of their plantation, since the year of 1796, the time of his emancipation, till his death in 1811, a period of 15 years. He was 60 years of age when liberated, and consequently 75 at his death.

FATHER Antonio, a capuchin monk, swore, by laying his hand on his breast, that he would, *in verbo sacerdotis*, tell the truth, &c. according to the manner in which Roman priests swear.

EVIDENCE was offered of the declaration of several of the nuns.

*By the Court.* It cannot be received. Individuals of a corporation cannot bind it, by any *act* of theirs; much less by any thing which they *say*.

THE will of the deceased contained a clause that he owed nothing to any body, neither did any person owe him any thing: and the defendants proved that a number of muskets being seized on their plantation, as they had no free person on it,

they were advised to free him—that the land he had occupied, was worth, according to some witnesses, one hundred dollars a year, and according to others, double that sum—that with a very fine gang of negroes, the plantation made nothing to sell, supplying the convent with milk, vegetables, rice, corn, and fuel; the number of the negroes thereon, at different periods, varied from 18 to 42.

FALL 1812.
I. District.

JACOB & AL.
*vs.*
URSULINE NUNS.

THE wages of overseers were proven to be from five to one hundred dollars a month.

*Rodriguez*, for the plaintiffs. The donation being void, it follows it is no payment, and the deceased's services being still without a reward, the defendants still owe the value of them. No specific price having been agreed upon, the services must be paid what they are fairly worth.

*By the Court.* A party, who works for another, is only entitled to wages, when he has stipulated for them, or when, by implication, the person who received the services promised to pay them. If the work be performed, in expectation of being rewarded by a gift, or by a legacy, wages will not be demandable.

As where the plaintiff had done much business for Mr. Guy (who bequeathed all his possessions to the hospital) and *had done it in contemplation of a legacy from him.* But being disappointed, after Guy's death, he brought this action

FALL 1812.
I. District.

JACOB & AL.
*vs.*
URSULINE
NUNS.

on a *quantum meruit* for his former services done for Mr. Guy, when it was adjudged, that it would not lie, the business having been done, not with a view to immediate or certain recompense, but with a view to a legacy. *Osborn* vs. *Governors of Guy's hospital.* 2 *Stra.* 728.

So where in an action on an apothecary's bill, for medicines and attendance on the testator. It appeared that the plaintiff had never made any regular entries in his books, but had attended the testator in expectation of a legacy, he being related to him ; and that he had declared, that had the testator left him any thing, that he would never have made a charge. The plaintiff was nonsuited on the above principle. *Hiccox* vs. *Proud. Staff. Lent Ass.* 1762, *cor. Wilmot. MSS.*

DURING a period of 15 years, no application was made for payment, and the will of the deceased says nothing is due him. Overseer's wages are paid quarter-yearly, and yearly, at farthest. It is not probable that if any had been expected, the deceased would have forborn any claim during fifteen years. It follows, perhaps, that gratitude for the greatest gift a man may receive, his freedom, induced the new freeman to continue his services, in the expectation that the nuns would continue to supply his wants, as long as he lived. Void as the instrument which contains the donation is, still, as the plaintiffs produced it, it is evidence of the ac-

knowledgment their father was willing to receive. An acknowledgment which precludes the idea that monthly, or yearly wages, were either promised or expected. But if the instrument, which was to be the evidence, was void, still the donation has been otherwise—the deceased has had the full effect of it: he has enjoyed the premises during the whole period mentioned in the instrument.

THE donation was made in 1801, and according to the petition, confirmed in 1804, when the deceased was 65 and 69 years of age: his services, after that age, were not perhaps worth much more than his support: this he appears to have had till his death. If it be believed that no wages were promised, or expected, for his services before the donation, it is for the jury to determine whether there is room to believe that any were expected, or promised, for the posterior services—whether they were not rendered without any hope of wages, but on the expectation that the nuns would provide for his support.

THE jury could not agree on a verdict.